UNITED STATES of America,
Appellee,

v.

Sean CARR, Defendant–Appellant.

Docket No. 04–0546–CR.

United States Court of Appeals,
Second Circuit.

Argued: March 31, 2005.

Decided: Sept. 14, 2005.

Tina Schneider, Portland, ME, for Defendant–Appellant.

Helen V. Cantwell, Assistant United States Attorney for the Southern District of New York (David N. Kelley, United States Attorney, David J. Berardinelli, Harry Sandick, Assistant United States Attorneys, of counsel), New York, NY, for Appellee.

Before: FEINBERG, SACK, and KATZMANN, Circuit Judges.

SACK, Circuit Judge.

The defendant-appellant, Sean Carr, appeals from a judgment of conviction following a jury trial in the United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*). The jury found Carr guilty of (1) conducting the affairs of an enterprise through a pattern of racketeering activity, (2) engaging in a racketeering conspiracy, (3) engaging in a narcotics conspiracy, (4) using and carrying a firearm during and in relation to a drug trafficking crime, and (5) distributing and possessing with intent to distribute cocaine base. The district court sentenced Carr principally to life imprisonment. On appeal, Carr asserts that the district court's instructions to the jury were erroneous and that the government inappropriately vouched for the credibility of its witnesses and bolstered their testimony in its rebuttal summation. Carr also raises several challenges to his sentence.

We conclude that the district court's instructions to the jury regarding its "duty" to convict Carr upon a finding that the government had proved a charge beyond a reasonable doubt were not in error. As for the district court's instruction that the jury must be unanimous as to each racketeering act charged, we conclude that, whether or not erroneous, the instruction was not prejudicial to Carr. We further conclude that errors, if any, in the prosecution's statements in rebuttal summation do not warrant a new trial. With respect to Carr's sentencing challenge, in light of the Supreme Court's decision in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and this Court's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), we remand the case to

the district court for consideration of re-sentencing.

## BACKGROUND

According to the evidence presented by the government at trial, during the years 1993 to 2001, Carr was a member of a street gang called "Sex Money and Murder" (SMM), which operated in the Bronx: in particular, in areas around a public housing project called the Soundview Houses. Testifying at trial, Carr admitted that he had been a drug dealer nearly all his adult life, and had sold cocaine base (or "crack") "[a]ll over" the Soundview section of the Bronx. Trial Tr., Aug. 14, 2003, at 912.

On March 4, 2003, an indictment was filed in the United States District Court for the Southern District of New York charging Carr, in five counts,[1] with (1) conducting the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 and 1962(c), (2) engaging in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d), (3) engaging in a narcotics conspiracy in violation of 21 U.S.C. § 846, (4) using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c), and (5) distributing and possessing with intent to distribute cocaine base in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C).

During the course of a three-week jury trial beginning on August 4, 2003, the government elicited testimony from various witnesses, and introduced into evidence an audiotape of an SMM gang meeting at which Carr was present and videotapes of Carr selling narcotics near the Soundview Houses. The government also presented physical evidence tending to establish Carr's involvement with SMM. The witnesses—including four former SMM members testifying pursuant to cooperation agreements—testified as to Carr's participation in crack sales and robberies, acts of intimidation, and other acts of violence.

As to one element of Count One, which charges that Carr engaged in "a pattern of racketeering activity," Carr was alleged to have engaged in three separate predicate acts.

The first of those charged predicate acts was the 1994 murder of one Tony Morton. On August 18, 1994, Morton was driving with a passenger near the Soundview Houses. Gang members became suspicious when Morton's car, with its tinted windows hiding the interior from their view, slowly drove past them. After the car had driven off, the SMM members retreated to apartments nearby to retrieve firearms to defend themselves. Upon returning to the place where they had originally encountered Morton, the SMM members spotted the car again. They approached it, opened its doors, and some of the SMM members dragged Morton's passenger out of the car at gunpoint while others pulled Morton out of the car. At trial, one SMM member, Brian Boyd, testified that while he was occupied with Morton's passenger, he saw Carr ride his bike up to Morton's car and shoot Morton. Another SMM member, Emilio Romero, testified similarly. Morton died of his wounds.

As the second predicate act alleged under the racketeering count, Carr was charged with the November 5, 1996 robbery of Valerie and Lewis Flythe. Valerie Flythe testified at trial that she and her husband were robbed at gunpoint by Carr

---

1. The original indictment contained six counts. One of them concerned only the activities of co-defendant Joel Young and was therefore redacted when the indictment was shown to the jury during Carr's trial.

and another member of the SMM gang in the Soundview Houses building in which they lived. Valerie Flythe had identified Carr in a police line-up. Carr subsequently pleaded guilty in state court to the crime, for which he received a two— to four-year sentence.

As the third predicate act alleged under the racketeering count, Carr was charged with engaging in a narcotics conspiracy. The government provided evidence, including videotapes of Carr selling cocaine base, tending to show that Carr had sold crack for many years.

Carr testified in his own defense. He admitted to selling narcotics, but denied being a member of the SMM gang, denied killing Tony Morton, and denied ever using a gun. He further testified that he had not robbed the Flythes. He said that he had pled guilty in state court only because he was told that if he went to trial he would receive a longer sentence. He also asserted that despite the contents of the audio recording of the SMM meeting, he was not a member of SMM; that indeed he had been the only non-member present at the meeting, but had been allowed to be present because "[t]hose are my friends."

After the presentation of the evidence, the district court instructed the jury. The instructions, which are central to Carr's appeal, are described separately in the "Discussion" section of this opinion.

On August 19, 2003, on the second day of deliberations, the jury returned a guilty verdict against Carr on all five counts. On Count One, the racketeering charge, the jury concluded that the government had proved beyond a reasonable doubt each of the three underlying racketeering acts for which Carr had been charged. On January 14, 2004, the district court sentenced Carr principally to life imprisonment.

Carr appeals from the judgment of the district court. He argues that: (1) the district court erred when it instructed the jury that it had a "duty" to convict Carr if it determined that the government had proved his guilt beyond a reasonable doubt; (2) the district court erred in instructing the jury that it had to reach unanimous agreement on each underlying racketeering act in order to conclude either that an act was "proved" or that it was "not proved"; (3) the government improperly both vouched for the credibility of its witnesses and bolstered their testimony in statements the Assistant United States Attorney prosecuting the case made during rebuttal · summation; and (4) Carr's sentence was enhanced based on facts not proven beyond a reasonable doubt, in violation of the rule established in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

## DISCUSSION

### I. The Jury Instructions

#### A. *Standard of Review*

We review a district court's jury instructions *de novo*, *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir.2000), "reversing only where appellant can show that, viewing the charge as a whole, there was a prejudicial error," *United States v. Tropeano*, 252 F.3d 653, 658 (2d Cir.2001). "An erroneous instruction, unless harmless, requires a new trial." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994). An error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

#### B. *The "Anti–Nullification" Instruction*

Carr argues first that the district court erred in instructing the jury that if it

concluded that the government had proved guilt beyond a reasonable doubt, the jury would have a "duty" to convict Carr. Carr contends that the instruction was in error because, by suggesting to the jury that it could not acquit if it found the government had met its burden, the district court's instruction erroneously and impermissibly suggested that the jury could not engage in "jury nullification." *See United States v. Thomas,* 116 F.3d 606, 608 (2d Cir.1997) (defining nullification as a juror's "intentional disregard of the law as stated by the presiding judge").

Because Carr did not raise this objection at trial, we review the district court's instruction for "plain error." *See* Fed.R.Crim.P. 52(b).

> The framework of the analysis for plain error pursuant to Rule 52(b) is the four-pronged test set forth in *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Rybicki,* 354 F.3d 124, 129 (2d Cir.2003) (in banc) (quoting *United States v. Thomas,* 274 F.3d 655, 667 (2d Cir.2001) (in banc) (citations, internal quotation marks, and alterations omitted)), *cert. denied,* —— U.S. ——, 125 S.Ct. 32, 160 L.Ed.2d 10 (2004).

> The district court instructed the jury:

> If there is proof beyond a reasonable doubt ... the government obtains a conviction. If there is a reasonable doubt, then there is an acquittal.

> ... [I]f after a consideration of all of the evidence, you have such a firm belief or conviction of the defendant's guilt on the count you are considering, the kind of belief or conviction that you would be willing to act upon without hesitation in matters of importance in your own lives, then you will say that there is no reasonable doubt. You'll say that the government has proven its case beyond a reasonable doubt. And in that event it is your duty to find a verdict of guilty on that count.

> On the other hand, if after a consideration of all the evidence or the lack of evidence, ... if you have the kind of doubt which would cause you to hesitate in acting on important matters in your own lives, then you'll say that you have a reasonable doubt, and in that event it is your duty to find a verdict of not guilty.

Trial Tr., Aug. 18, 2003, at 1133. Later in its instructions, the court elaborated, "[I]f ... you decide that the government has proved guilt beyond a reasonable doubt on the count you are considering, you will enter a finding of guilty, and you will not be dissuaded by any circumstance, whether sympathy or any other factor[,] in complying with that duty." *Id.* at 1166.

The district court thus suggested to the jury that nullification was not an option. Carr argues that such a suggestion is prohibited. We disagree.

 Our case law makes clear, as Carr concedes, that a trial court is not required to inform a jury of its power to nullify. *See, e.g., United States v. Edwards,* 101 F.3d 17, 19 (2d Cir.1996) ("While juries have the power to ignore the law in their verdicts, courts have no obligation to tell them they may do so. It appears that every circuit that has considered this issue agrees."); *see also id.* at 19–20 (citing cases). Nothing in our case law begins to suggest that the court cannot also tell the

jury affirmatively that it has a duty to follow the law, even though it may in fact have the power not to.

In *Thomas*, this Court "t[ook] th[e] occasion"

> to restate some basic principles regarding the character of our jury system. Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath administered to jurors in the federal courts, to "render a true verdict *according to the law and the evidence.*" Federal Judicial Center, *Benchbook for U.S. District Court Judges* 225 (4th ed.1996) (emphasis supplied). We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.

*Thomas*, 116 F.3d at 614 (footnote omitted). The Court continued:

> [I]n language originally employed by Judge Learned Hand, the power of ju-

ries to "nullify" or exercise a power of lenity is just that—a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent. It is true that nullification has a long history in the Anglo–American legal system, and that the federal courts have long noted the de facto *power* of a jury to render general verdicts "in the teeth of both law and facts." However, at least since the Supreme Court's decision in *Sparf v. United States*, 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895) (holding that, while juries are finders of fact, "it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them"), courts have consistently recognized that jurors have no *right* to nullify.

*Id.* at 615 (internal citations other than to *Sparf* omitted; emphasis in original).[2]

We do not appear to have addressed directly the use of language similar to that employed by the district court. But the

---

**2.** The Court observed, importantly, that:

> We are mindful that the term "nullification" can cover a number of distinct, though related, phenomena, encompassing in one word conduct that takes place for a variety of different reasons; jurors may nullify, for example, because of the identity of a party, a disapprobation of the particular prosecution at issue, or a more general opposition to the applicable criminal law or laws. We recognize, too, that nullification may at times manifest itself as a form of civil disobedience that some may regard as tolerable. The case of John Peter Zenger, the publisher of the *New York Weekly Journal* acquitted of criminal libel in 1735, and the nineteenth-century acquittals in prosecutions under the fugitive slave laws, are perhaps our country's most renowned examples of "benevolent" nullification. *See United States v. Dougherty*, 473 F.2d 1113, 1130 (D.C.Cir.1972) (Leventhal, *J.*); *see also* Shannon C. Stimson, *The American Revolution in the law: Anglo–American Jurisprudence before John Marshall* 52–55 (1990)

(describing Zenger trial). We are also aware of the long and complicated history of juries acting as judges of the law as well as the evidence, *see, e.g.,* John D. Gordan III, *Juries as Judges of the Law: The American Experience*, 108 Law Q. Rev. 272 (1992); Mark De Wolfe Howe, *Juries as Judges of Criminal Law*, 52 Harv. L.Rev. 582 (1939), and of the theoretical underpinnings of this practice in the United States, in which legal decisions by juries were sometimes regarded as an expression of faithfulness to the law (regardless of the authority of institutions or officeholders), rather than defiance of the law or "nullification."

*Thomas*, 116 F.3d at 614; *see also United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir.1993) ("Though jury nullification has a long and sometimes storied past, the case law makes plain that a judge may not instruct the jury anent its history, vitality, or use." (citation omitted)), *cert. denied*, 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

District of Columbia Circuit, considering a challenge very similar to Carr's, specifically approved of instructions that included the following language:

> The law does not require a defendant to prove his innocence, or to produce any evidence. If you find that the government has proven beyond a reasonable doubt every element of the offense with which the defendant is charged, and which I will define for you, it is your duty to find him guilty. On the other hand, if you find the government has failed to prove any element of the offense beyond a reasonable doubt, then you must find him not guilty.

*United States v. Pierre*, 974 F.2d 1355, 1356–57 (D.C.Cir.1992) (per curiam), *cert. denied*, 507 U.S. 1012, 113 S.Ct. 1665, 123 L.Ed.2d 283 (1993). The court concluded that "it was proper for the district court to instruct the jury that it had a duty to find appellant guilty if the government proved beyond a reasonable doubt every element of the offense with which he was charged." [3] *Id.* at 1357.

We agree with the D.C. Circuit. We can find no basis for a conclusion that the district court's instruction was, in this regard, erroneous. There being no error, it follows *a fortiori* that there was no plain error. *See Rybicki*, 354 F.3d at 129.

---

**3.** Carr relies primarily on the First Circuit's decision in *Sepulveda*, 15 F.3d at 1190. There, the court rejected an appellant's claim that he was entitled to a jury nullification instruction. *Id.* In doing so, the court approved of the trial court's instruction that the jury "should" convict the defendant if it found that the State had proven its case, and that it "must" acquit if it found that the State had not. *Id.* at 1189–90. However, the court's approval of such language does not establish a disapproval of the language at issue here. Indeed, the court made clear that a trial judge "may instruct the jury on the dimensions of their duty to the exclusion of jury nullifica-

*C. The Unanimity Instruction*

*1. The Instructions on the Racketeering Predicate Acts.* Carr also argues that the district court erred in its instructions to the jury regarding the jury's consideration of Count One, containing the racketeering charge. As noted above, that Count included allegations that Carr had engaged in three specific predicate acts. Only if the jury concluded that the government had proved beyond a reasonable doubt that Carr had committed at least two of them could it properly have convicted him of engaging in a prohibited "pattern of racketeering activity." *See* 18 U.S.C. § 1961(5) ("'pattern of racketeering activity' requires at least two acts of racketeering activity"). Over Carr's objection, the district court ultimately told the jury, in the court's instructions and supplemental instructions, that it must reach a unanimous decision in order to return a finding of "proved" *or* "not proved" as to any predicate act.

In its original instructions to the jury on the racketeering charge, the court stated, "[I]n order to convict, you must find that . . . Carr committed at least two of the acts of racketeering referred to in the indictment. . . . [Y]ou must be unanimous in your decision before you can make a finding of proved as to any of these acts."

tion." *Id.* (citing *United States v. Trujillo*, 714 F.2d 102, 105–06 (11th Cir.1983)). Similarly, in *United States v. Dougherty*, 473 F.2d 1113 (D.C.Cir.1972), a case upon which Carr also relies, the court approved of instructions that "never tell[] the jury in so many words that it must convict," *id.* at 1135, in the course of observing that defendants are not entitled to a jury nullification instruction. *Id.* at 1130–1137. As discussed in the main text, the District of Columbia Circuit later held squarely that juries may be instructed on their duty to convict upon a finding of guilt beyond a reasonable doubt. *Pierre*, 974 F.2d at 1357.

Trial Tr., Aug. 18, 2003, at 1144. The court emphasized that the jurors must also agree on which two predicate acts had been proved.

> [Y]ou must make an affirmative finding of proved for at least two of them in order for a conviction. Obviously, you can't have some jurors agreeing on racketeering act number one and some other jurors agreeing on racketeering act number two. You have to be unanimous, all 12 of you, before you can make a finding of proved on any one of these.

*Id.*

Although the court instructed the jurors that a finding of *"proved"* on any of the racketeering acts must be unanimous, it initially instructed the jurors that a finding of "not proved" need not be unanimous:

> [A]ny verdict of guilty or not guilty must be the unanimous verdict of all 12 sitting jurors. Any finding of proved with respect to the racketeering acts alleged in Count One must be the unanimous finding of all 12 jurors. Here *you do not need to be unanimous to say not proved*

[as to any one of the acts]. If you are not unanimous in favor of the proved finding, simply check not proved. But you must be unanimous on any proved finding, all 12 jurors on any finding.

*Id.* at 1165–66 (emphasis added).[4]

After receiving these instructions, the jury began deliberations. On the first day, the jurors met for about an hour. On the second day, after deliberating for several hours, the jury sent a note to the court asking, "If we cannot come to a unanimous agreement on one of the three racketeering acts, what do we do? . . . Can we leave the boxes blank?" Trial Tr., Aug. 19, 2003, at 1188.

The court discussed the question with counsel for the government and for Carr. They both were of the view that the court should simply restate its earlier instruction, saying that if the jury was unable to unanimously agree that an act was "proved," then it should return a finding of "not proved." But the court disagreed. It was apparently concerned about the possibility that repeating the original instruc-

---

4. By way of comparison, *Modern Federal Jury Instructions* provides, in pertinent part, as follows:

> Instruction 52–23
> Fourth Element—Engaging in a Pattern of Racketeering Activity
> The fourth element which the government must prove beyond a reasonable doubt is that the defendant engaged in a pattern of racketeering activity. . . .
> The government has charged the defendant with committing the following racketeering acts: [read the charged racketeering acts from the indictment]. You must find that the defendant committed two of these acts within ten years of each other.
> 1 Leonard B. Sand, *et al., Modern Federal Jury Instructions,* 52–42 (2005) (brackets in original).
> Instruction 52–24
> Fourth Element—Unanimity on Racketeering acts.
> The indictment charges the defendant with commission of [insert number alleged in the

indictment] racketeering acts. As I just instructed you, the government must prove beyond a reasonable doubt that at least two of the racketeering acts recited in the indictment were committed by the defendant within the prescribed time.
> You may not find the defendant guilty unless you all agree unanimously that at least two particular racketeering acts were committed by the defendant. It is not enough that you all believe that two racketeering acts were committed. That is, you cannot find the defendant guilty if some of you think that only racketeering acts A and B were committed by the defendant and the rest of you think that only acts C and D were committed by the defendant. There must be at least two specific racketeering acts that all of you believe were committed by the defendant in order to convict the defendant.
> *Id.* at 52–47 (brackets in original).

tion might result in what the court thought to be an erroneous verdict—if, for example, the jury reached a verdict of not guilty based on a unanimous "proved" finding as to one predicate act, a unanimous "not proved" finding as to another act, and the jury was unable to decide as to the third act.[5] In such a case, the court said, a verdict of "guilty" on the racketeering charge would be clearly inappropriate; but a verdict of "not guilty" would also be inappropriate because it could not be said that the jury had unanimously agreed on the verdict.[6] Under those circumstances, the jury would not have been able to agree that Carr's participation in at least two acts was "not proved."

In light of this concern, and over Carr's objections (the government eventually consented to the court's revised instructions), the court responded to the jury's request for clarification as follows:

> [I]n order to find the defendant guilty on Count One, the jury would have to be unanimous in finding that the government has proven ... beyond a reasonable doubt at least two of these three acts of racketeering.... [I]n order to find the defendant not guilty on Count One, the jury would have to find that the government had failed to prove at least two acts of racketeering.

*Id.* at 1207–08. The court continued:

> Now, what I'm really ending up saying to you is something which I think I did not make clear yesterday, and that is that to check either the box proved or the box not proved, there has to be a unanimous finding by all 12 jurors. If you're split 6–6, you can't check the not proved box. The not proved box has to be just as unanimous as a finding of not guilty as the ultimate finding.

*Id.* at 1210.

After receiving the supplemental instructions, the jury deliberated for approximately one-half hour. It then reached a verdict of guilty on all counts, including

---

**5.** The court stated in its discussion with counsel:

> Now, [the jurors] are apparently in disagreement on one [act], we do not know what they've done with the other two, and we don't know which is the one they're talking about. But let us suppose, and maybe you think this is unlikely, but let's suppose they have found, if they have treated my instructions as requiring a unanimous verdict here one way or the other, and if they have found not proved on two of them, then they would have to acquit. Because they're not going to find proved on two out of three. If they have decided that two of them are not proved, they have a basis for ... acquittal.
>
> Let's suppose that they have found one proved and they have found one not proved. And they're in disagreement about the third. They have put a check proved for one, not proved another, and they're in disagreement on the third. That means that they're not only deadlocked on an act of racketeering, they're deadlocked on the whole count. That's the problem that I see

as a possibility. And it's not just a deadlock on an act of racketeering. It's a deadlock which prevents them from making a unanimous finding of either guilty or not guilty.
Trial Tr., Aug. 19, 2003, at 1191–92.

**6.** As the district court explained to the parties:

> Look, there's got to be ... unanimity for a verdict of either guilty or not guilty. And here we have to assume, although we don't know, let us assume for [the] purpose of argument that the verdict now hangs on the third element in my sheet. Let's assume....
>
> ... [In order to find him not guilty], they would have to unanimously find that he did not commit at least two acts of racketeering.... It cannot be simply a split....
>
> In order to find him not guilty, they would have to find him not guilty of at least two acts of racketeering. And if they are split, so that they cannot make such a finding, then they're deadlocked and then there would be the need for further deliberations....
Trial Tr., Aug. 19, 2003, at 1195–97.

Count One. As to Count One, it reached a verdict of "proved" as to *all* of the three predicate offenses.

### 2. The Court's Asserted Direction to Find Carr Guilty.

■ Carr argues first that the instructions given by the district court effectively directed the jury to reach a guilty verdict on the racketeering count. With the instructions, Carr argues, "the jurors could have understood the judge to mean that unless all of [the jurors] agreed that proof was lacking, they had to convict." Def.-Appellant's Br. at 10.

This contention is meritless. There is no sense in which the court's instructions implied "that if the jury did not unanimously find the government's proof insufficient, it had to make a finding of 'proved.' " *Id.* at 24. Instead, the court repeatedly emphasized that the jurors could not conclude that the government had "proved" an act if they did not reach unanimous agreement that the government had proved the act beyond a reasonable doubt.[7] In the absence of any suggestion in the instructions that an inability to agree that a racketeering act was "not proved" could or should lead the jury to find instead that the act was "proved," we reject Carr's first argument.

■ *3. The Court's Asserted Reallocation of the Burden of Proof.* As we have noted, for a conviction under 18 U.S.C.

§§ 1961, 1962(c), which criminalize conducting the affairs of an enterprise through a pattern of racketeering activity, the government must prove a pattern of racketeering consisting of at least two predicate acts, 18 U.S.C. § 1961(5). And the jury must find that the prosecution proved each one of those two or more specifically alleged predicate acts beyond a reasonable doubt. *See Monsanto v. United States,* 348 F.3d 345, 346 (2d Cir.2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 153, 160 L.Ed.2d 49 (2004); *United States v. Dhinsa,* 243 F.3d 635, 670 (2d Cir.), *cert. denied,* 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001); *cf. Richardson v. United States,* 526 U.S. 813, 815, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) ("A jury in a federal criminal case brought under [18 U.S.C.] § 848 [criminalizing engaging in a continuing criminal enterprise] must unanimously agree not only that the defendant committed some 'continuing series of violations' but also that the defendants committed each of the individual 'violations' necessary to make up that 'continuing series.' "). It was not enough, then, for the jury in this case to decide unanimously that the government had proved two predicate offenses committed by Carr beyond a reasonable doubt without agreeing on which offenses they were. And the court so charged them.

But the court in its supplemental instructions also told the jury the obverse:

7. *See, e.g.,* Trial Tr., Aug. 19, 2003, at 1207 ("So in order to find the defendant guilty on Count One, the jury would have to be unanimous in finding that the government has proven a pattern of racketeering or, in other words, at least two acts of racketeering."); *id.* ("Let me repeat. In order to find the defendant guilty on Count One, the jury would have to find that the government has proven beyond a reasonable doubt at least two of these three acts of racketeering."); *id.* at 1208 ("I know this may be laboring it, but it's very, very important. Let me repeat.... In order

to find the defendant guilty on Count One, the jury would have to unanimously find that the government had proved at least two of these three acts of racketeering, at least two of the three, and the jury would have to be unanimous in finding one particular act and the second particular act."); *id.* at 1210 ("So let me repeat. In order to make a finding of proved or not proved, there has to be unanimity. In order to make a finding of proved, you have to unanimously find that the government has proved its case on that act of racketeering.").

that it was not enough to acquit the defendant for the jury to decide unanimously that the government had failed to prove two predicate offenses beyond a reasonable doubt. It had to decide unanimously as to each of at least two specific offenses that the government had failed to carry its burden of proof. And if the jury both failed to convict and failed to acquit, following those instructions, it was unable to reach a verdict, i.e., it was "hung."

We have our doubts, however, as to whether, had the jury agreed unanimously that the government had failed to prove two of the predicate acts beyond a reasonable doubt, without agreeing specifically as to which two had been "not proved," it should necessarily have reported itself as being at an impasse, rather than returning a verdict of acquittal for Carr. Hypothetically, for example, the jury could have agreed unanimously that Carr had *not* committed the first predicate act, murder, but divided on the proof of his guilt as to the second act, robbery, and third act, engaging in a narcotics conspiracy. It would in that case be possible that every juror voted "not proved" as to two predicate acts, the first one and one of the two others. This is not what happened and the issue is not therefore before us. But by its supplemental instructions, the district court implied that a jury thus divided must report itself at an impasse on the count in question. We are not convinced that, to the contrary, the jury could not under those circumstance properly vote to acquit the defendant. The fact that the jury "must agree unanimously and separately" as to every element of an offense, *Richardson,* 526 U.S. at 818, 119 S.Ct. 1707, in this case two predicate acts, in order *to convict* may or may not imply that the jury "must agree unanimously and separately" that the government has *not* proven its case beyond a reasonable doubt as to two specific predicate acts in order *to acquit.*

This is not, however, an issue we must decide today.

 But if the district court's instructions were in error in this regard, the error plainly had no effect on the verdict. As noted, the issue was raised by the jury's question, "If we cannot come to a unanimous agreement on one of the three racketeering acts, what do we do? . . . Can we leave the boxes blank?" Trial Tr., Aug. 19, 2003, at 1188. In response, the court assumed hypothetically that the verdict depended on the jury's decision as to that undecided third predicate act. Apparently concerned that the jury might acquit because it was divided as to the third act and was unanimously of the view that another predicate act was "not proved," the court instructed the jury (rightly or wrongly) that if it could not decide unanimously one way or the other as to each of two or more predicate acts, it should report that it was unable to reach a verdict on Count One.

But half an hour later, the jury reached a verdict, convicting Carr on all counts and in the course thereof concluding that the government had proved beyond a reasonable doubt *all three* predicate racketeering acts of which Carr had been charged. The meaning of the jury's question becomes, in retrospect, quite clear: It had decided unanimously that the government had established beyond a reasonable doubt that Carr was guilty of two predicate acts. Assuming of course that the other elements of the crime had been established, he was therefore guilty on Count One. But the jury had not achieved unanimity as to the third predicate act, and it wanted to know whether it had to. In fact it did not have to; once Carr lost as to two predicate acts, the jury's decision as to the third did not affect the jury's verdict on Count One. But having asked the question, prodded by the

court's response in the form of supplemental instructions, the jury returned to the jury room, resolved its doubts about the third predicate act, and decided that, like the first two, this one (whichever one it was) too had been proven beyond a reasonable doubt. Irrespective of that decision as to the third act, which, as we have said, was apparently the product of the challenged supplemental instructions, the defendant was duly convicted on Count One.

Put another way, the district court was explaining to the jury what it should do *if* it was *not* unanimous that Carr had committed each of two of the three charged predicate acts. Had the jury reported that it could not reach a verdict, rather than returning a verdict of guilty, that might have been a result of the supplemental instructions and therefore arguably incorrect. But, upon completion of deliberations, the jury *was* unanimous not only that two predicate acts had been "proved," but that all three had been. The challenged instructions apparently had no impact on the jury aside from forcing it to deliberate to a conclusion as to a third predicate act, which, it turned out, was unnecessary to the conviction.

As the government rightly points out, by requiring unanimity in a finding of "not proved," the district court did not alter its clear directive that unanimity was also required to find that an act was "proved." Appellee's Br. at 33. The instructions make very clear that to find Carr guilty, "the jury would have to unanimously find that the government had proved at least two of these three acts of racketeering . . .

and the jury would have to be unanimous in finding one particular act and the second particular act. [It] would have to be unanimous in those findings." Trial Tr., Aug. 19, 2003, at 1208. The court clearly and correctly instructed the jury that if it concluded that Carr committed only two of the acts, they were required to agree unanimously on *which two acts* in order to return a verdict of guilty. It would require a great leap of speculation to conclude that the instructions as to the jury's need to be unanimous in finding that two of three predicate acts had *not* been proved beyond a reasonable doubt somehow had a material effect on its unanimous decision that all three predicate acts *had* been so proved.

It is "clear beyond a reasonable doubt that [the] jury would have found the defendant guilty absent the [asserted] error." *Neder*, 527 U.S. at 18, 119 S.Ct. 1827. Since any error in the instruction was harmless, the verdict must remain undisturbed. *See Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994).

II. Vouching for the Credibility of Witnesses and Bolstering their Testimony

Carr also contends that the government improperly vouched for the credibility of its witnesses when it (1) asserted in its rebuttal summation that the cooperating witnesses "have to tell the government the truth" because they were testifying pursuant to cooperation agreements, and (2) argued that certain cooperating witnesses had already earned their 5K1.1 letters.[8]

---

8. Section 5K1.1 of the United States Sentencing Guidelines provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G.

§ 5K1.1. The district court explained to the jury:

[I]f a person was arrested for a federal crime and cooperates with the government . . . then under what's called Section 5K1[.1] of our federal sentencing guidelines, the government can write a letter to

In addition, Carr argues that the government impermissibly bolstered the testimony of its witnesses when it suggested that Brian Boyd had testified against SMM founder Pete Rollack and that the cooperating witnesses had repeatedly told "the same story," when there was nothing in the record to support either of those claims.

 It is well established that prosecutors may not "vouch for their witnesses' truthfulness." *United States v. Modica,* 663 F.2d 1173, 1179 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). In other words, a prosecutor is prohibited from "express[ing] his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *Id.* at 1178 (citation and internal quotation marks omitted). While the prosecution may not "vouch" for the credibility of its witnesses, "the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." *United States v. Thai,* 29 F.3d 785, 807 (2d Cir.) (citations and internal quotation marks omitted), *cert. denied sub nom. Lan Ngoc Tran v. United States,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *see also United States v. Cosentino,* 844 F.2d 30, 34 (2d Cir.) ("[The defendant's] counsel sufficiently raised matters of credibility in opening that the government could develop the whole cooperation agreements on di-

rect."), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988).

An improper remark by a prosecutor will justify a reversal by this Court "only if it causes the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef,* 190 F.3d 71, 78 (2d Cir.1999) (internal quotation marks, citation, and alterations omitted). Because Carr did not object at trial to the prosecutor's remarks that he now challenges, we must reject his claim unless it, *inter alia,* "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citation, internal quotation marks and alterations omitted). The statements must amount to "flagrant abuse," *United States v. Zichettello,* 208 F.3d 72, 103 (2d Cir. 2000), *cert. denied sub nom. Lysaght v. United States,* 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001), causing "substantial prejudice," *United States v. Bautista,* 23 F.3d 726, 732 (2d Cir.1994).

 Judged by this standard, Carr's arguments are unpersuasive. Beginning with its opening statement and throughout Carr's trial—from the cross-examination of witnesses to its summation—the defense continually sought to undermine the credibility of the government's witnesses by emphasizing that their testimony was provided pursuant to cooperation agreements. For example, Carr's attorney argued in his opening statement that Carr was

> very vulnerable to the . . . cooperating witnesses that are going to testify in this case, the cooperating witnesses who are

the judge who will perform the sentencing and call the judge's attention to that cooperation. And if the government writes such a letter, then the sentencing judge is not obliged to apply the guidelines. The sen-

tencing judge has the discretion to depart from the guidelines and impose the sentence that the judge feels is appropriate. Trial Tr., Aug. 5, 2003, at 95–96.

testifying to save their lives, cooperating witnesses who have made deals with the government hoping, praying that the information they give keeps them out of jail, because each and every one of them is facing almost certain lifetime incarceration.

Trial Tr., Aug. 5, 2003, at 36–37.

And in his cross-examination of the government's cooperating witnesses, defense counsel similarly suggested that the jurors should view the testimony skeptically because the government was the ultimate arbiter of whether or not the witnesses had testified truthfully and had earned a 5K1.1 letter. Continuing this line of attack, during his summation, Carr's attorney argued that "let's not say [the witnesses] don't have a motive to get the 5K[1.1] letter and all they have to do is tell the truth. Because, remember, it was the truth according to the government." Trial Tr., Aug. 14, 2003, at 1069. He argued that Romero and Boyd "are just willing to admit what they can admit and tell what they can tell and do as much as they can to get their 5K[1.1] letter, because they are going to jail for the rest of their li[ves]." *Id.* at 1071.

Considering the defense counsel's persistent attacks on the witnesses' credibility, the district court rightly permitted the government to introduce into evidence the various cooperation agreements and to elicit testimony about each cooperating witness's understanding of what his agreement required—specifically, to tell the truth. *See, e.g., Cosentino,* 844 F.2d at 34 (holding "that the written text of a cooperation agreement may be admitted during a witness' direct testimony whenever a defense attack on credibility in opening has made evidence of the whole agreement admissible"); *United States v. Smith,* 778 F.2d 925, 928 (2d Cir.1985) (noting that "truth-telling portions" of cooperation

agreements can properly be elicited on direct examination if a witness's credibility has been attacked).

The government's remarks in its rebuttal summation emphasizing that the cooperation agreements required that witnesses "tell the truth" in order to gain any benefits were also proper. As the government argued:

> [The cooperating witnesses] have to tell the truth. They have to tell the truth to the government, and they have to tell the truth to you, most importantly. Because if they don't tell the truth, then the government doesn't write them their letter. The only way they get that letter is if they tell the truth. It doesn't matter whether [Carr is] convicted or not. If they tell the truth, they still get their letter.

Trial Tr., Aug. 18, 2003, at 1106–07. The agreements did, after all, require that the witnesses "tell the truth" to benefit from them. And, with the cooperation agreements themselves properly admitted into evidence, "the prosecutor could properly argue that [the cooperating witnesses were] believable because [they] had an incentive to tell the truth, uphold [their] plea bargain, and receive a reduced sentence." *United States v. Robinson,* 8 F.3d 398, 416 n. 23 (7th Cir.1993). The prosecutor's statements did not amount to "express[ing] his ... personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *Modica,* 663 F.2d at 1178 (citation and internal quotation marks omitted). Rather, the statements were a "permissible reference to the evidence in the case." *United States v. Perez,* 144 F.3d 204, 210 (2d Cir.1998).

The government's further assertion that neither Boyd nor Romero had any reason to lie, and instead had every incentive not to jeopardize the benefits

they had already earned by testifying against others, was also proper argument. The government argued that "Boyd came into [sic] testify against Peter Rollack," and so,

> There's your letter. There's your 5K[1.1] letter right there.... Brian Boyd has provided his substantial assistance to the government. If he wasn't telling the truth about Sean Carr, why would he make that up? What possible motivation could he have for making that up? He's already got his letter.

Trial Tr., Aug. 18, 2003, at 1105. Similarly, the government argued that "Romero's already earned his letter, too. He's already testified in one trial against a high-ranking guy. He doesn't need to make stuff up about Sean Carr." *Id.*

It was established at trial that both Boyd and Romero had testified against other SMM members. The prosecution's statement that both had already earned their 5K1.1 letters therefore need not be interpreted as a conclusion that they had already been deemed to be truthful witnesses, even though perhaps it could be so construed. Instead, the statements could be understood as a simple, common-sense argument that a witness who has already agreed to testify against others would likely not jeopardize the potential benefits of providing such testimony—assuming it is truthful—by testifying untruthfully in another case. As such, the statements "did not amount to the government's improper vouching ... but simply constituted permissible argument ... that [the co-operating] witnesses, whose veracity and credibility had been fiercely attacked by defense counsel, had no motive to testify falsely." *United States v. Ricco,* 549 F.2d 264, 274 (2d Cir.), *cert. denied sub nom. Indiviglia v. United States,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977).

■ Carr also argues that the government referred to evidence not in the record and misled the jury when it suggested that "Boyd had testified against Peter Rollack." Def.-Appellant's Br. at 31. Carr argues that, not only did Boyd not testify against Rollack, but the record does not even indicate that Boyd was prepared to testify against Rollack.

In its rebuttal summation, as noted, the prosecution did say that Boyd "came into [sic] testify against Peter Rollack." Trial Tr., Aug. 18, 2003, at 1105. In fact, as the government acknowledges, Boyd eventually did not testify against Rollack, because Rollack ultimately pleaded guilty. At trial, although it does not appear that Boyd referred specifically to Rollack, Boyd testified that he had, indeed, cooperated against many others, including identifying the photographs of "nearly 30 people[ ]," telling the government "about guys that [he] was dealing with, that [he] was doing things with," and agreeing to testify against others in addition to Carr. Trial Tr., Aug. 5, 2003, at 196–97. As a result, we conclude that although the language employed by the government may have been unclear and arguably may have suggested that Boyd had testified against Rollack when in fact he was merely prepared to testify against other SMM members, any error did not rise to the level of "flagrant abuse."

■ Finally, Carr contends that the prosecutor's statement that "it's hard to keep your stories straight through ten meetings with the Government," *id.* at 1107, was improper bolstering of testimony because it misleadingly suggested that two former SMM members who had testified against Carr had provided testimony that was consistent over numerous meetings with the government, when in fact, the defendant argues, there was no evidence to support such a suggestion.

Although the prosecutor's statement[9] could indeed have been understood by the jury to refer to evidence not in the record by suggesting that the cooperating witnesses' testimony was consistent over multiple meetings with the government,[10] we conclude that, as with each of Carr's other claims of prosecutorial misconduct, even if there was error, read in the context of the trial as a whole, it was insignificant.

We conclude that none of the government's assertions in its rebuttal summation were "so prejudicial that a new trial is required." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir.), *cert. denied*, 506 U.S. 847, 113 S.Ct. 139, 121 L.Ed.2d 92 (1992).

### III. Sentencing Enhancement

■ Finally, Carr argues that the district court's sentence pursuant to the Sentencing Guidelines and the court's enhancement of the sentence based on facts not found by a jury or admitted by Carr (including enhancements based on drug quantity, use of a firearm, and criminal history) was unconstitutional under *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

■ Following the Supreme Court's decision in *United States v. Booker*, — U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), "a sentencing judge violates the Sixth Amendment by finding facts and *mandatorily* using them to enhance a sentence above the Guidelines range that would have been applicable based solely on

facts found by the jury." *United States v. Williams*, 399 F.3d 450, 453 (2d Cir.2005) (emphasis in original). In *United States v. Crosby*, 397 F.3d 103, 119–20 (2d Cir.2005), we determined that where a defendant raises a Sixth Amendment challenge to his sentence on appeal that he did not preserve below, *Booker* mandates that we remand the case to the district court to consider whether it would have imposed a different sentence had the Guidelines been advisory and considering all the factors listed under 18 U.S.C. § 3553(a), and if so, to resentence the defendant. We therefore remand the defendant's case to the district court for further proceedings in light of *Crosby*.

■ Before remanding, however, we address Carr's objection to the district court's previous application of the Sentencing Guidelines. *See United States v. Gonzalez*, 407 F.3d 118, 124 (2d Cir.2005) (determining that inasmuch as an issue as to the application of the Guidelines previously decided by the district court might be raised again in the district court in the course of a *Crosby* remand, this Court would address it prior to the remand). This is a question the district court will again be required to decide on remand because, post-*Booker*, it must still consider the appropriate Guidelines sentence along with the other section 3553(a) factors in arriving at the correct sentence.

Carr contends that the district court erred in applying the base offense level for

---

9. The prosecutor's precise statement on the subject was:

> Ladies and gentlemen, it's hard to keep your stories straight through ten meetings with the government. We saw it was hard to keep the story straight even with the two defense witnesses under a few hours of cross-examination in total.
>
> It's hard to tell the same story many times if it's not true.

Trial Tr., Aug. 18, 2003, at 1107.

10. There was, as the government pointed out, evidence in the record that the Romero had met with the government "more than ten" times, *see* Trial Tr., Aug. 7, 2003, at 393–94, and, similarly, that Boyd had done so "a lot of times," *see* Trial Tr., Aug. 5, 2003, at 169.

the federal offense of first degree murder. One of the underlying racketeering acts for which Carr was found guilty was second-degree murder under New York Penal Law. The Guidelines required the district court to apply the base offense level for the "analogous federal offense" in order to calculate Carr's base offense level for the murder of Tony Morton. U.S.S.G. § 2E1.1, appl. n. 2 ("If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used."). Carr argues that because second-degree murder under New York law requires only that he "unlawfully, intentionally and knowingly" murdered Morton, the "analogous federal offense" could not be first-degree murder, since that requires a finding of "malice aforethought," *see* 18 U.S.C. § 1111(a).[11] However, as we made clear in considering a virtually identical challenge in *United States v. Minicone*, 960 F.2d 1099 (2d Cir.), *cert. denied*, 503 U.S. 950, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992), "the district court did not err in concluding that the most analogous federal offense [to the New York offense of second degree murder] was first degree murder under [18 U.S.C.] § 1111," *id.* at 1110. "[T]he absence of reference to premeditation or malice aforethought [in the state law] does not mean that federal first degree murder is not the most analogous federal offense." *United States v. Diaz*, 176 F.3d 52, 123 (2d Cir.), *cert. denied sub nom. Rivera v. United States*, 528 U.S. 875, 120 S.Ct. 181, 145 L.Ed.2d 153 (1999). We therefore conclude that Carr's argument in this regard is without merit.

---

11. Carr argues that the "most analogous federal offense" should have been second-degree murder. Def.-Appellant's Br. at 41. Under the federal murder statute, however, *both* first— *and* second-degree murder require "malice aforethought." *See* 18 U.S.C. § 1111(a) ("Murder is the unlawful killing of a human being with malice aforethought."). By Carr's logic, neither first nor second-degree murder can be the most analogous federal offense to New York second-degree murder.

## CONCLUSION

For the foregoing reasons, we affirm Carr's judgment in all respects except we remand for consideration of resentencing in light of *Booker* and *Crosby*.